THE MATHESON COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10619.    Promulgated February 28, 1951.

*Leonard W. Ferris, Esq.,* for the petitioner.
*Maurice S. Bush, Esq.,* for the respondent.

484

OPINION.

DISNEY, *Judge:* In its applications to the Commissioner for relief, petitioner invoked subsections (b) (1), (4) and (5) of section 722. Here it relies only upon subsections (b) (1) and (5).[1]

As grounds for relief in the claims filed with the Commissioner under subsection (b) (1) petitioner relied upon events which it classified by the term "Loss of management." The same events were relied upon as factors for relief under (b) (5). The statement made by petitioner for each claim, sets forth, among other things, the illness and subsequent death of Matheson; that Mrs. Matheson was a drug addict; that after Matheson became ill, it was impossible for him or his wife to manage the business or employ anyone capable of doing so; that the litigation with McLaughlin was not only expensive but distracted employees and made the old corporation's existence uncertain, and as a result, throughout the entire base period the business was "without executive management of any kind." One of the affidavits, signed by Roger Breslin, asserts that the old corporation was without management after Matheson suffered a stroke in 1936.

In its petition, petitioner alleged that the old corporation was without management during the entire base period. The opening brief of petitioner refers, as clearly events under subsection (b) (1), to the operation of the business "without responsible management" after Matheson became ill and as factors under subsection (b) (5) to the claim that Mrs. Matheson was not only incapable of managing

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\* \* \* \* \* \* \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

\* \* \* \* \* \* \*

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

\* \* \* \* \* \* \*

the business but that her and her husband's condition made it impossible to hire a manager; and that under the prevailing circumstances, Dugan was unable to furnish "anything approaching management." In its reply brief, petitioner admits that there was some kind of management, and then concedes that this Court has no duty to distinguish between good and bad management. Under the circumstances, we regard petitioner as having abandoned its contention that the character of the management of the old corporation in the base period after Matheson became ill.is an event or factor for us to consider under the issue.

Despite abandonment of management as a basis for relief, as set forth in its claim and petition, the petitioner asserts that certain events occurred, with certain results, and that factors existed, during the base period, to diminish[2] the normal operation and output of the old corporation. Reference is then made to the illness of Matheson, the actions of McLaughlin, the physical condition of Mrs. Matheson and her participation in the business in spite of her condition, the lack of qualifications of Dugan to conduct the business, the uncertainty that existed whether McLaughlin would succeed in his efforts to acquire the business or whether the Mathesons would "continue as owner," and the inability of the Mathesons to give Dugan orders, authority, or advice. These events appear to us to be essentially matters of management.[*] The petitioner, however, prefers to treat them as "events unusual and peculiar" in its experience, under subsection (b) (1).

The regulations, however, provide that: "Unusual and peculiar events contemplated in section 722 (b) (1) consist primarily of physical rather than economic events or circumstances." Regulations 112, section 35.722–3 (a). The regulation is consistent with the report of the Committee on Finance, Senate Rept. No. 1631, page 198, 1942–2 C. B. 649. The events being relied upon here can not be regarded as physical events. The same paragraph of the regulation goes on to explain that such events would include floods, fires, explosion, strikes, etc., also to state that they "would not include economic maladjustments such as higher prices of materials * * * or any other agent of production * * *." We consider that the events relied on by petitioner do not fall into the category of physical circumstances.

Regardless, however, of the nature of the events required for relief under subsection (b) (1), the net income during the base period must, if relief is to be obtained, be an inadequate standard of normal earnings because "* * * normal production, output, or operation was interrupted or diminished * * *."

---

[2] The term was used without any apparent intent to abandon the theory that, in addition thereto, there was an interruption of business.

There is nothing in the facts here which establishes that the circumstances relied upon "interrupted or diminished" the normal production, output, or operation of the business. The illness and subsequent death of Matheson gave rise at most to no more than loss of his personal physical services for the remainder of the base period. This was not interruption, but was permanent. Operation, largely without his physical assistance, was the normal state of affairs for the old corporation at all times after he suffered a stroke in April 1936. So far as diminution is concerned, McLaughlin, as early as May 1936, held out to Dugan that he was representing Mrs. Matheson, and it does not appear that his authority in that regard was questioned prior to June 1937. In the meantime, he became a joint stockholder with the Mathesons and was authorized to act on behalf of the directors. His participation in the affairs of the business, legally or illegally, a matter we need not attempt to resolve, may have caused, as petitioner alleges, some anxiety on the part of employees as to their jobs and future policy of the business, but nothing in the facts is contrary to the idea that operations continued without interruption or diminution under the guidance or direction of Dugan, without interference by McLaughlin, until May 1937, when he discharged Dugan and appointed another employee to take over his duties. Dugan testified that he was familiar with the methods Matheson had of obtaining new business, that he had greater responsibilities after Matheson became ill; that he was permitted to take full charge of sales; and that there was no restraint on his conduct of the business, except as to financial matters.

The habit Mrs. Matheson had of taking drugs, and her physical condition in other respects, can not, under the circumstances here, be treated as an event effective to interrupt or diminish normal business, under the statute. Nothing appears in the facts contrary to the idea that the condition did not exist for a long time prior to the base period and, if so, her ailments would not be an "unusual or peculiar event in the experience" of the old corporation, occurring immediately prior to or during the tax period. Whatever infirmities she had, to affect her in taking up where Matheson left off, were cured by her designation to act for her of, first, McLaughlin and then Breslin. It is not shown that her disabilities were such that the business of the corporation was interrupted or diminished.

After the occurrence of the alleged events, Dugan carried on the activities of the old corporation to the best of his ability, a fact conceded by petitioner, without, as he testified, any restraint, except as to financial matters, on how he should conduct the business. After April 1936 operation of the business under the handicaps alleged by petitioner was normal for the old corporation and no proof was made

that the alleged events interrupted operations for any period of time, or diminished operations.

However, even if we were to assume that events, recognizable under subsection (b) (1), occurred and continued, as alleged by petitioner, nevertheless they must, in order to be given effect under the statute, in the language of section 722 (b), have resulted in "an inadequate standard of normal earnings. In *Monarch Cap Screw & Mfg. Co.*, 5 T. C. 1220, 1228, we said that the phrase "refers to a standard or measure of earnings which falls below that established over a reasonable length of time and under normal conditions by the taxpayer or by other taxpayers engaged in the same or a similar business under comparable conditions. It is such a standard as would result in 'an abnormally low excess profits credit'." We went on to compare the average base period net income with that of the previous period, from 1930, and concluded that the operations in the base period were "reasonably within the realm of normalcy, as established by the experience of the petitioner." Regulations 112, section 35.722-3 (*a*), also, on this point, states:

The taxpayer's normal production, output, or operation for those years in which interruption or diminution has been established may be determined by reference to its average production, output, or operation with respect to products or services of the same class. This determination may be made in the light of the experience of the taxpayer prior to its first excess profits tax taxable year (but not after May 31, 1940) or in the light of the experience of a comparable competitor or of an industry of which the taxpayer is a member, engaged in manufacturing or selling the same products or rendering the same services. No particular years or specific number of years in such experience need be selected in establishing normal production, output, or operation. * * *

Earnings of another taxpayer engaged in a business similar to the old corporation under comparable conditions are not in evidence for comparison. The old corporation had earnings totaling about $4,000 in 1929 and 1930 and net losses aggregating about $15,000 during the years 1931, 1932, and 1933. The financial result of operations in 1934 was not available for proof. The net losses were reduced to $346.87 in 1935, $52.84 in 1936, and $368.92 in 1937. Net income of $4,466.68 was realized in 1938 and $8,458.09 in 1939. Net sales were only about $400 less in 1936 than the prior year and in 1939 they were about $14,000 in excess of those for 1936. The profit in 1938 was earned in spite of an increase of only about $950 in net sales over 1937. A comparison of the earnings with the profits realized after 1939 is prohibited. Section 722 (a); *Clinton Carpet Co.*, 14 T. C. 581. The above figures disclose net losses as a standard or norm for the period prior to the base period, and net earnings as standard during the base period. They not only fail to bear out the idea that during the base period the actual profits were not representative of normal earnings, but, on the contrary, disclose affirmatively a condition in excess

of normal for petitioner. Therefore, notwithstanding the alleged events relied upon by the petitioner, and even assuming their existence, the petitioner has wholly failed to demonstrate that average base period net income is an inadequate standard of normal earnings for the old corporation. We find no grounds for relief under subsection (b) (1).

Little need be said concerning the application of subsection (b) (5). To be entitled to relief under its provisions, it must at least be shown that some factor reasonably resulted in an "inadequate standard of normal earnings." If the earnings during the base period were normal, no relief may be granted, *Clinton Carpet Co., supra.* Here, as above seen, they were even better than normal, in view of which no relief may be given under subsection (b) (5).

The petitioner argues also that regardless of its right to relief under section 722 it is entitled under section 711 (b) (1) (J) of the Internal Revenue Code to the restoration of the compensation paid the Mathesons during the base period years to its income for such years and the disallowance of this compensation as a deduction in determining average base period net income. It is pointed out that under subsection (J) (i) of section 711 (b) (1) under the heading of "Abnormal Deductions" that "Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer." Since no reliance is placed upon subsection (J) (ii), it is clear that reliance is placed only upon abnormality in class and not in amount. It is equally clear to us that the deductions for compensation to the Mathesons were not, so far as the record before us shows, abnormal in class. The services of the Mathesons appear to be placed by the petitioner in the class of management, and management to a corporation of the nature of petitioner is obviously the normal thing. The petitioner has contended that there was no management but, in effect, agrees that there was some. We think the petitioner has made no showing in this respect of abnormality as to the deductions for the Mathesons. Moreover, subsection (K) (ii) requires a showing by the petitioner that the alleged abnormality was not a consequence of a change in the manner of operation of the business. In fact, the petitioner's contention appears to be that the abnormality in deduction was a result, in part at least, of a change in manner of operation, in that A. M. Matheson is alleged to have no longer operated as usual the affairs of the company, and that it had to be otherwise carried on. For these reasons alone it must be held that no showing has been made under section 711. In addition, we think the petitioner which, of course, has the burden has not met it on the facts. The amounts paid to A. M. Matheson were $3,672.80 for 1936, $7,200 for 1937, and $340 for 1938. He suffered a stroke on April 8, 1936, and died on January 25, 1938. It is apparent that as chairman of the board and

president up to 1938 and as treasurer up to April 8, 1937, he may have earned considerable salary; and the amount involved in 1938 is small, though the period he lived in that year is short. He had, after the stroke, discussed business affiars with Dugan, and signed checks for about 60 days. He did not resign as treasurer until April 8, 1937. Leo McLaughlin from about May 1936 exercised at least some supervision until about June 1937, when Breslin was retained to protect the interest of Matheson and his wife, and consulted Mrs. Matheson an average of three or four times a week, until 1940. Nothing appears as to what Matheson and wife paid Breslin, or McLaughlin—though McLaughlin was paid by the corporation, $817 in 1936 and $2,105 in 1937. The Mathesons secured some one to look after corporate matters, and may, for such substitution for themselves, have paid over to Breslin and McLaughlin the amounts paid them by the corporation. Florence H. Matheson was paid nothing in 1936 and 1937, and $5,200 for each of the years 1938 and 1939. Though a drug addict she at times acted normal. She acted promptly to protect the corporate interests by causing McLaughlin to remove his appointee to fill Dugan's place, and likewise promptly by going to the prosecuting attorney about Leo McLaughlin's actions. She frequently consulted with Breslin. Payments, particularly those to Matheson in 1936, may have been additional compensation for past services. *Lucas* v. *Ox Fibre Brush Co.*, 281 U. S. 115. The record here is entirely *too* indefinite *to* say that Florence H. Matheson did not earn the payments made to her. On this evidence, we can find nothing to require the conclusion that the amounts paid the Mathesons, and claimed and allowed as deductions in the base period years, should be thrown back into income, and we so hold. This renders it unnecessary to consider other questions raised by the parties as to the claim for such disallowance in computation of excess profits tax credit.

The petition in this case states that deficiencies for years ending December 31 of 1943 and 1944 have not been determined but that the decision in this case will determine whether or not such deficiencies should be determined and the amount thereof, if any, and further states certain amounts as estimated as being in dispute for 1943 and 1944. No further mention of the years 1943 and 1944 in this respect is made throughout the case or upon briefs. No deficiencies were determined for those years. We hold that they are not herein involved.

There remains the matter of correct computation of excess profits tax credit, to reflect net capital reductions in the credit, based on income. The parties stipulate the matter in part and appear willing to stipulate it altogether.

Because of stipulation by the parties

*Decision will be entered under Rule 50.*

Reviewed by the Special Division.