JACOB'S FORK POCAHONTAS COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11174.   Promulgated September 21, 1951.

*Geo. E. H. Goodner, Esq.,* and *Scott P. Crampton, Esq.,* for the petitioner.

*Roy Wentz, Esq.,* for the respondent.

358

OPINION.

DISNEY, *Judge:* The only question presented is whether the petitioner is entitled to any relief from excess profits taxes for 1940, 1941, and 1942 and, if so, the amount thereof. The petitioner claims relief in this proceeding solely under section 722 (b) (4), Internal Revenue Code.

Under section 722 (b) (4) the petitioner must show that during or immediately prior to the base period it either commenced business or changed the character of its business. Though the petitioner was incorporated on June 21, 1935, it makes no claim that it commenced business "during or immediately prior to the base period." Petitioner's case is based primarily upon the contention that it "changed the character of the business" by the acquisition of a new mining lease in the fall of 1939, which change petitioner contends resulted from a "difference in the capacity for production or operation" within the language of section 722 (b) (4). Although before the end of the base period the petitioner had mined about 2,200 tons of coal from the new lease, and states that it had built tramroads to the new lease, almost doubled its investment in mine cars, and added to its investment in locomotives, the gist of its position is that acquisition of the new lease is a change in character of business. Petitioner points out the addition of equipment in 1940 but any such addition was, of course, not during the base period and can not be considered.

Our problem here is to interpret the meaning of "difference in the capacity for production or operation." Did the petitioner during the base period change the character of its business by making a differ-

ence in its capacity for production or operation? After reviewing all of the evidence we have come to the conclusion that it did not. In our view, merely increasing the amount of land available for mining does not increase capacity for production except perhaps in the very broadest sense and in a sense not compatible, we think, with the objects of the excess profits tax law, including section 722. The addition of more land available for mining might, of course, eventually result in a greater total production than would be available from original holdings, and if the expression "capacity for production or operation" could reasonably, in the light of the objectives of the statutes involved, be so broadly construed as to mean, in effect, capacity for ultimate total production, petitioner's view would be correct; but we can not so interpret the crucial phrase. Capacity for production appears to be the ability of a given plant to produce that which it is designed to create or produce and is expressed in terms of the number of units manufactured, created or produced in a given period. It was in this sense that "capacity for production" was used in *National Grinding Wheel Co.*, 8 T. C. 1278, where, we said, the maximum capacity of petitioner's ovens at the end of the base period was about three times what it was at the beginning. In *Chicago Distilling Co. v. Stone*, 140 U. S. 647, the Supreme Court construed sections 3259, 3264, 3309, and 3311 of U, S. Revised Statutes, involving the quotation "spirit-producing capacity" of a distillery; and the Court concluded that "those expressions mean no more than average producing capacity in a given time." We see nothing different in principle in the question before us and believe that "capacity for production" in the statute we now interpret means mere "average producing capacity in a given time," that is, actual ability to produce within a given time. Capacity for production, in such sense, is not increased by the mere acquisition of additional raw material though therefrom a greater total production would, of course, be the final result. Thus, the capacity for production of a steel mill is rationally gauged by the number of tons of steel per day or per year and the acquisition of a large backlog of pig iron or other raw material, for use in the future and not necessary in the given period, would not increase the plant's capacity for production, in any ordinary or reasonable sense. We see no difference between the acquisition of raw material to be used in the future, by a steel mill, and the acquisition by the petitioner of land for mining purposes. It is clear from the record before us that the petitioner's plant could have been engaged to capacity, in the mining of the lands it had before acquisition of the 1,035 acres, far beyond the base period. The meaning of "capacity" is "dependent entirely upon its relationship to the subject matter under consideration," 9 Corpus Juris 1275; and the meaning is to be arrived at "from consideration of all of the statutory provisions having relation to the subject matter," *Campbell*

v. *Cornish*, 22 P. 2d 63. In our view, the excess profits tax law, designed as it was to cause taxation of unusual profits during a war period, and section 722 to prevent inequities in such taxation, had to do with a more or less temporary situation, and the interpretation of "capacity for production or operation" should, therefore, not be so greatly broadened as to mean the total amount of production which might eventually over a long period of years be attained. Clearly. if the new 1,035 acres of land produced coal in paying quantities the lease thereof would finally result in greater production; but this, in our view, is beyond the intent of the statutes involved. Though the petitioner did produce some coal within the base period from the new lease nothing of record indicates that such amount of production was because of the acquisition of the new lands and could not have been produced from the original leases had the same effort been there placed. Indeed, the record though somewhat indefinite indicates that the new lease was acquired late in 1939, yet production of coal in August 1939, 19,243 tons, was considerably higher than at any time later in that year, thus indicating that the acquisition of the new lands and the mining of 2,200 tons therefrom did not increase the capacity of petitioner's plant for production. September's production was higher than any later month in that year. Thus, if we disregard the fact that the lease was actually not executed until June–July 1940, for the reason that such idea is not argued, we must nevertheless notice that correspondence between petitioner and the lessor companies though starting in 1938 reached the point of proposing terms by August 23, 1939, and that agreement to enter the contract appears not earlier than September 5, 1939, also the fact that it was not until November 17, 1939, that the petitioner advised that its prospecting had proceeded to the point where it wished to accept the proffered terms. Apparently, therefore, the approximately 2,200 tons of coal produced from the new lease was in November or December 1939. The lease when finally executed is dated December 1, 1939. The fact that production in those months was less than in August and September negatives the idea that acquisition of the new lands increased the petitioner's capacity for production of operation.

We recognize that the acquisition of new lands, so much better for mining purposes that the petitioner's plant could have been used to produce therefrom more coal in a given time than from the earlier lease, might have resulted in an increase in capacity for production, but such a situation is not disclosed by the record before us. The petitioner has not so argued. There is no doubt that as petitioner's counsel at trial said "our case is based on the acquisition of this new lease in the fall of 1939." It is true that the petitioner contends that "top and bottom" conditions were better in the new mine, also that the grades in

the new mine were somewhat better, and that there were additional investments in tramroads; but after review of all the evidence in this regard we have concluded that the new land has not been shown to offer greater capacity for production from petitioner's plant. The suggestion that there were additional investments in mine cars and locomotives we find unjustified by the record before us. The amount of production, petitioner's witness testified, was a matter depending upon conditions; and it has nowhere been shown or argued that, absent and aside from the acquisition of the new lease, the conditions were such that capacity for production was increased, merely because of any additional investments in mine cars, locomotives or tramroads.

We conclude and hold upon all of the evidence that the petitioner has not shown that during or immediately prior to the base period it changed the character of its business by a difference in the capacity for production or operation.

Since the statute provides that in addition to making such showing of change of character of business the petitioner must show that average base period net income does not reflect normal operation for the entire base period of the business and must establish a fair and just amount representing normal earnings to be used as a constructive average base period net income, it is apparent that in the absence of proof of the change of character of business it would be dictum for us to examine further as to reflection of normal operation over the base period, or as to computation of a constructive average base period net income.

We conclude and hold that petitioner has not shown it is entitled to relief under section 722 (b) (4) of the Internal Revenue Code.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*