OPINION. Tietjens, Judge: The petitioner has the burden of proving that its excess profits tax is excessive and discriminatory, and to establish what would be a fair and just amount representing normal earnings. Its tax is deemed excessive and discriminatory for purposes of section 722 of the Internal Revenue Code if its average base period net income is shown to have been an inadequate standard of normal earnings for one or more of the reasons stated in section 722 (b). Petitioner relies upon section 722 (a) and subparagraphs (2) and (5) of section 722 (b).[1] Petitioner is a member of the bituminous coal industry, engaged in both mining and selling bituminous coal. Petitioner’s principal contention is that its tax is excessive and discriminatory because the business of the bituminous coal industry, including petitioner, was depressed during the base period by reason of temporary economic events unusual in the case of such industry (section 722(b)(2)). Petitioner next contends that, if the events are not considered causes which entitle it to relief pursuant to subparagraph (2) of section 722(b), they should be recognized as grounds for relief under subpara-graph (5). The parties are in agreement that the bituminous coal industry was a depressed industry prior to 1937. This condition is shown by the statistics of the industry’s characteristic losses or low profits. It was recognized in the several acts of Congress which sought to alleviate this condition, and in the comments of the Supreme Court in passing upon the legislation.[2] The Bituminous Coal Act of 1937 was one of those measures. Its provisions were upheld in a decision of the Supreme Court in May 1940. (Sunshine Anthracite Coal Co. v. Adkins, 310 U. S. 381). Under this statute, approved April 26, 1937, the Bituminous Coal Commission, created pursuant to the Act, inaugurated a schedule of prescribed minimum prices which were generally higher than the then prevailing market prices. These were made effective in December 1937. In February 1938 the Commission revoked the orders establishing minimum prices. Certain Circuit Courts of Appeals also enjoined enforcement of the prices. The Commission then proceeded through extensive hearings to collect facts on which to base a new schedule which was promulgated in 1940, subsequent to the base period, after the Supreme Court had upheld the statute and the injunctions were dissolved. Whatever benefit accrued to petitioner because of the fixed prices was enjoyed for the period of less than three months during which they were effective. Petitioner contends that the revocation of the original price schedule and the bar by injunction of any fixed prices during the pendency of the litigation, which lasted through the remainder of the base period, constituted temporary and unusual economic events within the meaning of section 722 (b) (2) which had the effect of depressing between February 1938 and March 31, 1940, both the industry of which petitioner is a member and petitioner’s business. Petitioner says that the effect of these actions was to reduce its income during the remainder of the base period and that petitioner’s actual base period earnings would have been higher by the difference between the actual market price it received and the fixed minimum prices applied to the same sales tonnage, if these events had not occurred. Petitioner has submitted a computation reaching the figure of $331,306.55 as the amount by which its earnings would have been increased if the fixed prices had remained in effect. We think petitioner has not proved its case. In the first place it has not been demonstrated that petitioner’s average base period net income, as adjusted pursuant to section 713, is an inadequate standard of normal earnings. “Normal” earnings refers to a measure established over a reasonable length of time and under normal conditions by the taxpayer, or by others under comparable conditions. Monarch Cap Screw & Manufacturing Co., 5 T. C. 1220. In that case we said that the mere fact that a taxpayer’s profits were not large does not establish that its business was depressed, when large profits were not customary in its industry. See also Toledo Stove <& Range Co., 16 T. C. 1125. Respondent has computed from the income tax returns of petitioner and its predecessors for the fiscal years 1923 to 1940 the “comparative net income or loss,” that is, the income as it would be adjusted to conform to the definition of excess profits tax net income, for the purpose of comparing such income for the base period years with that for the taxable years or the years preceding the base period. Considering petitioner’s earnings history as embracing that of its component corporations, in accordance with section 722 (e) (2), it is to be noted that operation of the Wilson Mine resulted in practically continuous losses throughout the fiscal years 1923-1933, inclusive. The average comparative net loss sustained from the operation of the Wilson Mine for the 14-year period ending March 31,1936, was $6,680 per year. The average annual operating profit from the mine for the base period years was $146.49. The average annual comparative net income from the non-mining operations for the 14-year period ending March 31,1936, was $11,150, while the average annual operating profit from this part of petitioner’s business for the base period years was $53,403.88. The annual average comparative net income realized from all operations for the base period was $53,748. The corresponding average comparative net income for the 14-year period immediately prior to the base period was $4,456, and for the inclusive period of 18 fiscal years ended in 1940 was $15,410. There were loss years from 1928 through 1933, and the average of the combined earnings for the following 3 years of net profits, 1934, 1935, and 1936, was less than $33,000. On the basis of these comparisons we cannot conclude that petitioner’s business was depressed in the base period or that petitioner’s average base period net income of $53,748 was an inadequate standard of normal earnings. Foskett & Bishop Co., 16 T. C. 456; Matheson Co., 16 T. C. 478; Avey Drilling Machine Co., 16 T. C. 1281. The earnings of approximately $215,000 in the four-year base period were higher than for any four consecutive fiscal years prior to the base period in petitioner’s history shown by the record. The addition of another $330,000, or any similar sum, to compute a constructive average base period net income in an effort to establish a fair and just amount representing “normal” earnings in place of this actual average would be wholly unjustified. While it is apparent that petitioner’s business was not depressed in the base period years, as compared with other years in petitioner’s history, and that is sufficient to dispose of the case, we may observe that the circumstances relied upon as a ground for relief do not constitute temporary and unusual economic events cognizable under section 722 (b) (2). They were administrative and judicial acts, based upon legislation, and although they had economic effects upon the bituminous coal industry, including petitioner, they were not economic events within the meaning of section 722 (b) (2). Acme Breweries, 14 T. C. 1034. Nor do these events or actions, even if they constitute “other factors affecting the taxpayer’s business,” qualify petitioner for relief under section 722 (b) (5). Petitioner was in an industry where competition and low earnings were normal conditions. The projected system of fixed prices was designed as an expedient to improve these conditions. We may assume, though respondent argues strongly that such an assumption would not be justified, that had the fixed prices continued petitioner would have had better earnings in the base period. These better earnings would not be normal. The revocation of the prices did not result in an inadequate standard of petitioner’s normal earnings'in the base period; it merely eliminated a possibility of increased earnings. This is not a basis for relief. In Alexandria Amusement Corporation, 16 T. C. 446, a theatre which was not permitted to operate on Sundays during the base period years but was permitted so to operate in 1941 and thereafter, sought relief based, in part, upon the earnings it would have had in the base period had it then been operated on Sundays. We there denied relief, explaining that section 722 is not a means of extending equitable relief to all taxpayers affected by the excess profits tax (p. 456). The conclusion in that case is likewise applicable here. The respondent did not err in denying the relief sought. Reviewed by the Special Division. Decision will be entered, for the respondent. Sec. 722. (a) General Rule. — In any case In which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * * (b) Taxpayers Using Average Earnings Method. — The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the ease of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— ******* (2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry, ******* (5) of any other factor affecting the taxpayer’s business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein. “* * * For a generation there have been various manifestations of incessant demand for federal intervention in the coal industry. The investigations preceding the 1935 and 1937 Acts are replete with an exposition of the conditions which have beset that industry. Official and private records give eloquent testimony to the statement of Mr. Justice Cardozo in the Garter case (p. 330) that free competition had been ‘degraded into anarchy’ in the bituminous coal industry. Overproduction and savage competitive warfare wasted the industry. Labor and capital alike were the victims. Financial distress among operators and acute poverty among miners prevailed even during periods of general prosperity. * * *» Sunshine Anthracite Coal Co. v. Adkins, 310 U. S. 381, at p. 395. See also Appalachian Coals Inc. v. United Statest 288 U. S. 344 and 1 F. Supp. 399.