TRIANGLE RAINCOAT COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27317.   Promulgated December 29, 1952.

*Benjamin Mahler, Esq.*, and *Joseph Henry Cohen, Esq.*, for the petitioner.

*John A. Clark, Esq.*, for the respondent.

552

**OPINION.**

Rice, *Judge:* In determining petitioner's excess profits tax liability for the taxable years 1941, 1942, and 1943, respondent computed petitioner's excess profits credit on the invested capital method as provided in section 714 of the Code because that method resulted in a larger credit than a computation on the income method under section 713 of the Code. Our findings show that the credit used by respondent for each taxable year exceeded $12,000, whereas petitioner's actual average base period net income, as reported, amounted to only $7,157.87, and

if computed under section 713 (e) (1) such net income amounted to only $8,698.73. Under these circumstances if petitioner is to secure any relief under a subsection of section 722, it must prove that its actual average base period net income was an inadequate standard of normal earnings, the amount that would constitute a fair and just amount representing normal earnings to be used as a constructive average base period net income, and that such amount would result in a larger credit than the credit computed under the invested capital method. Petitioner recognizes its burden for it states on brief that to secure relief it must enlarge its actual average base period net income by more than $5,000.

We will consider, first, petitioner's contention that it qualifies for relief under section 722 (b) (1), the pertinent portions of which appear in the margin.[3] Petitioner contends that during its first base period year its normal production, output, or operation was interrupted or diminished by a strike which was an event unusual and peculiar in its experience within the meaning of the statute. Petitioner contends further that because of such strike its actual average base period net income is an inadequate standard of normal earnings, which resulted in an excessive and discriminatory tax, and it submits a constructive average base period net income of $19,882.50, which it contends would be a fair and just amount representing its normal earnings.

Respondent concedes that the strike at petitioner's plant in August 1936 is an unusual event within the meaning of section 722 (b) (1), and that petitioner is entitled to reconstruct its base period net income, if it has established the further requirement that because of the strike its actual average base period net income was an inadequate standard of normal earnings. The necessity of proving that the inadequacy of its earnings was a result of the strike is recognized by petitioner and is required by prior decisions of this Court. *Matheson Co.*, 16 T. C. 478 (1951) ; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220 (1945).

The petitioner relies upon the following as proving that its earnings for the base period were inadequate: (1) that it lost an estimated production of 32,000 units or garments because of the strike which

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b). TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer.

\*           \*           \*           \*           \*           \*           \*

could have been sold for approximately $83,000; (2) that it lost one of its most profitable customers (Princess Garment Co.) due to the strike; and (3) that settlement of the strike increased its labor costs in 1936 by $7,453.90, which costs could not be offset by increased prices as its prices were fixed in its catalogues.

Petitioner's only witness was its general manager, who estimated the production lost in 1936. He allocated the estimated loss as follows: 2,500 units or garments in the last week of July; 20,000 units in August; 4,000 to 5,000 units in September; and 4,000 to 5,000 units in October. The general manager's estimate assumes that there was a slow down of production for 4 weeks before the strike and a continuing effect on production for 9 weeks after the strike. The tables in our findings showing petitioner's monthly production do not, in our opinion, support petitioner's estimate of the amount of production lost as a result of the strike. Petitioner's production in 1936 exceeded its production for any other year during the period 1934 to 1939, inclusive. A comparison of its production for the last half of these years indicates that production in the last 6 months of 1936 was at about the same rate as the aggregate for the other 5 years in this period. It is, of course, true that petitioner lost production during August due to the strike, but, on this record, the lost production was either taken care of through inventories, the estimated monthly amount of which appears in our findings, or the production lost because of the strike was made up by increased production after the strike, or the loss in production was taken care of through a combination of inventories built up before the strike and increased production after the strike.

Although petitioner's production and operation were interrupted by the strike, it does not appear that the strike had any serious effect on petitioner's 1936 or its average base period net income. Our findings show that 1936 was the most profitable year in petitioner's existence from 1927 to 1940, and that its 1936 sales volume was exceeded only by 1939. This record does not show that petitioner's sales volume or its net income decreased because of the strike. We cannot agree, therefore, with the petitioner that its sales volume would have been approximately $83,000 more in 1936 if the strike had not occurred. Nor can we agree that if an additional estimated 32,000 units had been produced, and sold, petitioner's 1936 net income would have been increased proportionately. The general manager's testimony that the garments could have been sold at an average price of $2.594 ($83,000 divided by 32,000) is a conclusion unsubstantiated by any persuasive evidence. The evidence shows that petitioner operated in a keenly competitive market. Whether this market could and would have absorbed an additional 32,000 garments has not been

demonstrated. The favorable conclusions that petitioner draws from a comparison of production and sales for selected months and periods in 1936 with 1939 are refuted by an over-all comparison of production and sales for the two years. The difference in sales volume may well have resulted from the higher unit prices received for woolens and the 17,663 reversibles sold in 1939. In any event, it does not follow that a higher sales volume will necessarily result in an increased net income because the comparison of 1936 with 1939 shows that although 1939 sales exceeded 1936, the 1936 net income exceeded 1939 net income.

Petitioner's second contention on the 722 (b) (1) issue deals with its account with the Princess Garment Company. It is contended that because of the strike, petitioner was unable properly to service this customer with the raincoats ordered and as a result the account was lost. This contention is based almost entirely upon the testimony of petitioner's general manager, who testified that he had "always contended" that this account—

> * * * would have stayed as a major account if it had not been for the bad service that we gave them during the year of the strike. They were more vulnerable to poor service than the average account.

After testifying that the Princess Garment Company might have taken their raincoat business to a competitior or competitors, or might have decided to gradually ease away from petitioner as a source of supply, the general manager testified as follows:

> I cannot answer what was in their mind, but the net result of it is we lost their account. It hung over for several years in a declining amount. * * *

The testimony upon which petitioner relies does not establish that the Princess Garment Company account was lost because of the strike. On the contrary, it establishes that petitioner does not know and is only speculating as to the reasons for the loss of the account. This seems odd in view of the fact that petitioner's sales to Princess Garment Company, in 1935, constituted over 15 per cent of its total sales for that year. An account of this size, in a competitive market, is nourished and protected; it is not allowed to dwindle away because an unusual circumstance has temporarily interferred with normal operations. It is difficult to believe that if the strike, with its resulting poor service, was the cause of petitioner's losing the account, that affirmative evidence thereof could not have been produced. The absence of such affirmative evidence, together with the numerous other possible reasons for the loss of the account, precludes any determination in petitioner's favor on this contention.

Petitioner's final contention on the 722 (b) (1) issue is that the increased wages paid as a result of the strike increased its 1936 cost of operations, and that such costs could not be offset by a corresponding increase in sales price because its prices had been fixed by the is-

suance of its catalogues. There can be no question about the existence of the strike or that petitioner agreed to and did pay increased wages in settlement of the strike. But this is beside the point. Relief under 722 (b) (1) is granted where an unusual event exists and as a result thereof the average base period net income is an inadequate standard of normal earnings. Petitioner's 1936 earnings have not been shown to be inadequate, and what petitioner is saying here is that if it had not paid the increased wages its 1936 profits before taxes would have been $7,453.49 more than they were. A similar assumption could be made with respect to almost any factor entering into the computation of net income. While section 722 computations require certain assumptions to be made, such assumptions must comport with reason when associated with known facts. *D. L. Auld Co.*, 17 T. C. 1199 (1952). Petitioner has failed to establish that the brief interruption and diminution of production, output, and operation, caused by the strike, resulted in an inadequate standard of normal earnings. On this issue, therefore, we hold for the respondent.

Petitioner's second claim for relief is based upon a "change in the character of its business" within the meaning of section 722 (b) (4), the pertinent provisions of which appear in the margin.[4] It claims that because of (1) a difference in the products furnished and (2) a difference in the capacity for production or operation, its business did not reach, by the end of the base period, the earning level it would have reached had the change been made two years earlier. These claims will be considered separately in the order above stated.

Petitioner's contention, that its base period net income is inadequate because of a difference in the products furnished, is based upon the addition to its line of raincoats and rain garments of a line of woolen garments including a special type of wool coat known as a reversible. It is contended that these woolen items represented a drastic and material change in petitioner's type of production, and that in each year subsequent to the commencement of the change, petitioner's sales of woolen garments increased but had not by the end of 1939 reached the earning level which it would have reached had the change been made two years earlier.

---

[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) Taxpayers Using Average Earnings Method. * * *

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes * * *, a difference in the products or services furnished, a difference in the capacity for production or operation, * * *.

Respondent's position is that petitioner's manufacture of woolen garments did not change the character of its business for the reason that petitioner had been constantly searching over a period of years for an off-season item which would take up the slack in production during the first half of the calendar year. He contends that the entire line of off-season items manufactured by petitioner should be considered as a whole, and that changes in styling and fabrics do not constitute a difference in the products furnished within the meaning of section 722 (b) (4). He relies upon *Stonhard Co.*, 13 T. C. 790 (1949), Regulations 112, and the Bulletin on Section 722.

Section 35.722–3 (d) of Regulations 112 deals with "Commencement or change in character of business." Among other things it states that for the purposes of section 722 (b) (4) a change in the character of the business

must be substantial in that the nature of the operations of the business affected by the change is regarded as being essentially different after the change from the nature of such operations prior to the change. No change which businesses in general are accustomed to make in the course of usual or routine operations shall be considered a change in the character of the business for the purposes of section 722 (b) (4). Trade custom and practice may be taken into account in determining whether an essential difference in the character of the business has occurred. A change in the character of the business, to be considered substantial, must be reflected in an increased level of earnings which is directly attributable to such change. If such increased level of earnings is not actually realized in the base period, the taxpayer is not precluded from establishing a change in the character of the business provided it can establish that such increased level would have been attained in the base period but was hindered or delayed by unusual and peculiar events or economic circumstances. Such proof may not take into account any increase in earnings after December 31, 1939, as indicative of the fact that a change in the character of the business was productive of increased earnings.

This Court in *Wisconsin Farmer Co.*, 14 T. C. 1021 (1950), accepted the general principles outlined in the above regulations.

Under the regulations, in order to secure relief under 722 (b) (4) because of a difference in the products furnished, petitioner must show that the change is substantial for the reason that (1) the nature of its operations is essentially different after the change, and (2) a higher level of earnings resulted (with the exception contained therein which is not material here) which is directly attributable to the change in character of its business. Respondent's Bulletin on Section 722, at page 50, points out that the addition of a new product must represent more than a usual or customary event in the type of business in which the taxpayer is engaged; that in certain types of business it is customary to eliminate unprofitable lines and add new lines, such as a business where the products are affected by changes in the style; and that in such businesses variations in products would not qualify as differences in the products furnished.

In the *Stonhard* case, *supra*, the taxpayer claimed that it changed the character of its business during the base period by the introduction of three new products which it contended represented a difference in the products furnished. In denying relief, we pointed out that these three products fitted into the general line of products being sold by the taxpayer, that they were not a departure from and did not represent any change in the character of the taxpayer's business, that they were relatively small new products which the trade would recognize as mere additions to taxpayer's line, and that they did not affect the type of customers solicited, open new markets, change sales policies, affect manufacturing, or materially affect earnings. We distinguished the *Stonhard* case from *Lamar Creamery Co.*, 8 T. C. 928 (1947), for the reason that the introduction of a new product by the latter changed it from a small business operator to one of the largest in its area, with new methods of merchandising, solicitation of new customers for its new product, and quantity production of the new product. These changes in the character of the business of Lamar Creamery Co. were considered substantial enough to qualify it for relief under 722 (b) (4), but no such conditions were found to exist in the *Stonhard* case.

The present case involves circumstances similar to those existing in the *Stonhard* case. Petitioner's rainwear were outer garments made out of various waterproofed fabrics. Its woolen garments were also outer garments made of wet-proof or water-repellent woolen materials. The line of woolen merchandise fitted in with and supplemented petitioner's line of raincoats, and the woolens replaced the line of sport jackets which petitioner had been manufacturing as an off-season item. Petitioner's catalogues show that the addition of a line of waterproofed woolen garments represented no substantial departure from its normal operation of manufacturing rainwear from various waterproofed fabrics, including tweeds, wool and silk tweed, seersucker, percale, crepe de chine, jersey, gabardine, Harris type tweed, leatherette, etc., all of which are described in the merchandise set forth in its 1934–35 catalogue. The manufacture of outer garments from waterproofed woolens was not essentially different from the manufacture of outer garments from other waterproofed fabrics. The woolen garments were accepted by the trade as a normal addition to the line of weatherproofed outer garments manufactured by petitioner. Some new customers were attracted by the addition of the woolen garments, but raincoat customers were also purchasers of the water-repellent woolens. The use of waterproofed woolens in manufacturing its merchandise created no new product for petitioner whereby new markets were opened up or new types of customers acquired. Its products continued to encounter the same highly competitive markets with its woolens that it did with its other rainwear. Petitioner made no change in its sales policies with the introduction of its lines of woolen

garments. On this record, it cannot be said that the nature of petitioner's business operations was essentially different, after the change, from the nature of such operations prior to the change. Cf. *Avey Drilling Machine Co.*, 16 T. C. 1281 (1951).

Furthermore, petitioner fails to meet the other requirement of the regulations, namely, that a change in the character of the business, to be considered substantial, must be reflected in an increased level of earnings which is directly attributable to such change. Our facts show that the introduction of woolen garments brought about no increased level of earnings. As a matter of fact, petitioner's profits before taxes for 1937, the first year after it had quantity production of its woolen garments, were the lowest during the period 1927 to 1939, inclusive. And in none of the base period years, subsequent to 1936, did petitioner show any increased level of earnings. In our opinion, petitioner has failed to show that it changed the character of its business because of a difference in the products furnished. We, therefore, approve respondent's determination on this portion of the 722 (b) (4) issue.

Petitioner's other claim for relief under section 722 (b) (4) is based upon its contention that it changed the character of its business during the base period by a difference in the capacity for production or operation. Petitioner contends that a change in capacity occurs under the law and the regulations either when latent capacity is utilized, or when a general rearrangement of machinery occurs which converts an ordinary into an assembly-line method of operation. It is contended that both of these factors are present here due to the rearrangment of petitioner's equipment and the utilization of hitherto unavailable space which resulted in streamlining operations in its plant.

The evidence in this case does not establish that there has been a change in the character of petitioner's business due to a difference in its capacity for production. Petitioner did not show the capacity of its plant prior to or during the base period years. In terms of units or garments produced, 1936 was petitioner's best year. Upon the basis of production figures after 1936, there was no increase in petitioner's capacity as a result of the rearrangement of petitioner's equipment and the utilization of hitherto unavailable space. The record provides us with no unit for measuring petitioner's capacity other than its actual production figures. Cf. *Jacob's Fork Pocahontas Coal Co.*, 17 T. C. 357, 363 (1951).

Furthermore, the additional space, which petitioner utilized in the building after the landlord remodeled it, was not "latent capacity" within the meaning of the regulations. It was idle capacity. Latent capacity refers to the utilization of hidden or dormant qualities in productive or operative equipment through newly developed techniques, whereby the productive or operative capacities of such equip-

ment are expanded.[5]  Nothing of this nature occurred here.  Petitioner used the additional space made available by its landlord's expenditures to relieve the cramped quarters occupied by its cutting department, and to change the routing of its work in process so as to eliminate loss of time and some expense.  This was normal, routine administration of its business.  Naturally, there was a difference in its operations after moving and resetting its equipment, and purchasing the Soabar machines, but the differences were not substantial, and the changes served an economic purpose without any demonstrated increase in petitioner's capacity for production.  *Farmers Creamery Co. of Fredericksburg, Va.*, 18 T. C. 241 (1952).

In view of the foregoing, we hold that petitioner has failed to establish that its actual average base period net income was an inadequate standard of normal earnings so as to entitle it to relief under section 722 (b) (1) or (b) (4).  It is unnecessary, therefore, to consider petitioner's method of reconstructing average base period net income, or its other contentions.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

[5] See Bulletin on Section 722, page 56.

