THE CROWELL-COLLIER PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 40202. Filed* March 19, 1956.

---

*Findings of Fact have been made and are filed as part of the official record of this case but are not printed in full as a part of the Opinion.

*Jay O. Kramer, Esq., G. I. Falk, Esq.,* and *Josiah Willard, Esq.,* for the petitioner.

*Arthur N. Mindling, Esq.,* and *John A. Clark, Esq.,* for the respondent.

OPINION.

BLACK, *Judge:* The deficiency notice mailed to petitioner on February 1, 1952, among other things, stated as follows:

You are advised that the determination of your income tax liability for the taxable year ended December 31, 1942, discloses an overassessment of $447.86; that the determination of your income tax liability for the taxable years ended December 31, 1943 and 1944, discloses a deficiency of $33,759.96; that the determination of your declared value excess profits tax liability for the taxable year ended December 31, 1943, discloses a deficiency of $576.82; that the determination of your declared value excess profits tax liability for the taxable year ended December 31, 1944, discloses an overassessment of $3,798.99; and that the determination of your excess profits tax liability for the taxable years ended December 31, 1943, 1944 and 1945, discloses a deficiency of $1,866,250.35, as shown in the statement attached.

After careful consideration of your applications for relief under sections 711, 721 and 722, of the Internal Revenue Code, filed June 15, 1944, July 30, 1945, October 10, 1946, October 7, 1948, and June 21, 1949, it has been determined that you have not established your right to the relief requested in such applications.

Because of the deferment under section 710 (a) (5) of the Internal Revenue Code of the tax liability shown on your return, the determination of your excess profits tax liability results in a deficiency.

The relief now claimed by petitioner in its petition is for "overassessments and/or refunds" as follows:

| Calendar year ended December 31 | Overassessment of excess profits tax |
| --- | --- |
| 1943 | $1, 699, 248. 64 |
| 1944 | 609, 527. 74 |
| 1945 | 432, 169. 68 |

The assignments of error in the petition are numerous and need not be set out here in detail. These assignments of error raise the following issues:

1. Whether or not petitioner is entitled to relief under section 722 (b) (4) of the 1939 Code on the ground that its average base period net income was an inadequate standard of normal earnings because of the discontinuance at the end of the base period of its magazine Country Home.

2. Whether or not petitioner is entitled to relief under section 722 (b) (4) of the 1939 Code on the ground that its average base period net income was an inadequate standard of normal earnings because of changes which it made during the base period from the letterpress method of printing to a substantial use of the high-speed multicolor gravure method of printing.

3. The determination of petitioner's constructive average base period net income resulting from both or either of the qualifying factors set forth in 1 and 2 above.

4. Whether or not petitioner is entitled under section 721 of the 1939 Code to eliminate abnormal income resulting from gravure research and development.

5. Whether or not petitioner is entitled under section 711 of the 1939 Code to eliminate certain abnormal expenses incurred during base period.

Thus it will be seen that the only questions litigated in this proceeding involve petitioner's claim for relief and refunds under section 722 (b) (4), section 721 (a) (2) (C), and section 711 (b) (1) (J) and (K). The years involved are 1943, 1944, and 1945.

Petitioner, for years the publisher of national magazines including Collier's, Woman's Home Companion, The American Magazine, and Country Home, has two primary contentions in support of its claim for relief under section 722 (b) (4). It contends, first, that its average base period net income was an inadeqaute standard of normal earnings because Country Home magazine, which had experienced losses in prior years, including all the base period years, was discontinued at the end of the base period. Petitioner contends that it is also entitled to relief under section 722 (b) (4) because during the base period it introduced a change from the letterpress method of printing its magazines to the use in a substantial degree of a high-speed multicolor gravure method, with resulting cost savings. Should it be held to have established that it is entitled to relief by reason of these two 722 (b) (4) grounds, petitioner contends that its proper constructive average base period net income (CABPNI) would be approximately $4,000,000, instead of average base period net income, adjusted for section 711 (b) relief allowed, of $2,804,170.60 to

$2,811,837.76. Its unadjusted average base period net income was $2,712,338.90.

Extended findings of fact have been made and are filed as a part of the official record of the case. Such part of these findings of fact as is deemed necessary will be stated as we rule upon the several issues which have been presented to us for our decision.

### Discontinuance of Country Home Magazine.

The parties are in no serious dispute that the discontinuance during the base period of Country Home suffices to meet the initial "qualifying factor" requirement of section 722 (b) (4). So much is conceded by respondent and has been established in our findings. A matter of dispute between the parties is the amount of the Country Home loss which should be eliminated during the base period years. The publication of this magazine was discontinued in December of 1939. Prior to that time and during the base period petitioner had experienced losses from its publication of Country Home shown on its books in amounts approximately as follows:

| Year | Amount |
|------|--------|
| 1936 | $165,000 |
| 1937 | 364,000 |
| 1938 | 749,000 |
| 1939 | 685,000 |
| | $1,963,000 |
| Annual average | $490,750 |

Petitioner's publication of various magazines in reality was the operation of one business, and the elimination of one of the magazines would not effect a cost saving of all the charges allocated to it on petitioner's books. Some such charges would not be reduced at all and others would be only partially reduced. Both parties are in agreement as to this but dispute the amount of expenses which should be eliminated in arriving at the losses to be used for adjustment. Petitioner would fix these continuing costs for 1939, for example, at approximately $32,000, while respondent contends that at least $334,000 of Country Home costs continued for that year.

Considering all of the evidence submitted on the issue, none of which satisfies us as justifying any mathematically certain result, we have arrived at an appropriate adjustment for the continuing costs which is reflected in the CABPNI set forth in our ultimate findings of fact. Undoubtedly such continuing costs as remained would not be eliminated by discontinuing the publication of Country Home in 1939. We have endeavored to give full effect to this fact in our reconstruction.

*Gravure Printing.*

There is a fundamental difference between petitioner's letterpress and its high-speed multicolor gravure printing, which relates to both the process and the equipment. This fact, we think, was clearly established by evidence at the hearing. Gravure printing is a form of intaglio printing and entails the transfer of ink from recesses or depressions in the printing plate or cylinder to the paper as distinguished from the use of a letterpress plate where the ink is carried on a raised design. Gravure preparation is more elaborate and detailed than that for letterpress and calls for workers who are more highly skilled and who require longer training. Gravure preparatory workers are difficult to find and petitioner had to institute an elaborate training program to supply them. Such training takes a number of years to complete. We have found as a fact that a printing plant which changes from exclusive letterpress to substantial amounts of gravure printing undergoes a basic fundamental and substantial change. Petitioner first purchased high-speed gravure presses in 1934, and put them into operation with the February 1936 issue of Woman's Home Companion. Petitioner, in November 1937, projected a change and replacement schedule in its printing presses which would have made it, when completed, primarily a high-speed gravure plant. By the end of the base period it actually had obtained 6 presses capable of high-speed gravure work. The schedule called for the eventual acquisition of 17 high-speed gravure presses. In addition to the 6 such presses installed in the base period petitioner also installed 2 other presses before the end of 1941. In round figures, during the base period, petitioner's letterpress and high-speed multicolor gravure presses printed the following number of Collier-size pages of combined 1- and 2- and 3- and 4-color:

| Year | Letterpress | Gravure |
|------|------------|---------|
| 1936 | 17, 500, 000, 000 | 800, 000, 000 |
| 1937 | 17, 800, 000, 000 | 2, 000, 000, 000 |
| 1938 | 15, 700, 000, 000 | 2, 000, 000, 000 |
| 1939 | 14, 700, 000, 000 | 4, 000, 000, 000 |

It can be seen by this that by the end of the base period petitioner had not become primarily a gravure plant for its 1- and 2- and 3- and 4-color printing; but it had greatly increased its use of multicolor gravure. Although monotone gravure printing had been used by petitioner from an early date in the 1920's, it was not until the base period that a substantial shift from letterpress to high-speed multicolor gravure took place. We believe that this was not a routine change, "a mere improvement of older equipment or ordinary technological improvements developed to perform the same functions in the same manner," but was a "substantially different process of manufacturing"

and the introduction of substantially different equipment within the intent of section 722 (b) (4). See *Brown Paper Mill Co.*, 23 T. C. 47, 70.

As we have many times said, a taxpayer seeking relief under 722 (b) (4), in addition to showing the substantial change, must also show that there was a higher level of earnings directly attributable to the change. *Union Parts Mfg. Co.*, 24 T. C. 775. Respondent would have us dispose of the case at bar out of hand on the proposition that petitioner has not met this second requirement of showing a higher level of earnings by the end of the base period. While it is true that petitioner's actual earnings during the base period were greater in 1936 and 1937 than they were in 1938 and 1939, respondent has failed to consider the principle recognized by this Court that cost savings may be accredited as establishing a higher level of earnings even though the actual net income has not correspondingly increased. This is amply supported by the logic that had the cost savings not been effected the actual earnings would have been even less or the net result might have been a loss. In a comparable situation we recently said in *Charis Corporation*, 22 T. C. 191, 201:

As a direct result of the change petitioner's normal earnings were increased over what they would have been had the change not been made. It is immaterial that due to other causes petitioner's over-all earnings decreased after the change was made. The pertinent factor is that petitioner's base period earnings would have been considerably smaller than they were had the * * * [change not been made].

As will subsequently appear, such is the case here.

Respondent contends that petitioner's decision to use multicolor high-speed gravure printing seriously affected its competitive position in the national advertising field, and that this and various other relatively permanent factors, of both internal and external origin, established petitioner as having a relatively permanent decline in its normal earnings during the base period years within the meaning of E. P. C. 42 (1949–1 C. B. 144). Respondent urges that petitioner was sustaining a substantial loss of competitive position during the latter part of the base period because it was unable to capture its usual share of the total advertising revenue available and because it was unable to maintain a given level of profits in the face of its declining share of the market; that among the factors was the alleged inferiority of magazines printed in gravure, the low-cost competitive advantage of radio which enabled it to take a large share of the advertising market; and the strong competition by the picture magazines such as Life and the news magazines such as Time. Respondent also urges that petitioner's lower level of earnings in 1938 and 1939 was caused by and directly reflected the increase in the volume of the

gravure printing upon which petitioner is seeking section 722 relief; and that a consideration of E. P. C. 42, 30, and 13 requires appropriate adjustments for all relatively permanent base period changes. On the basis of the foregoing, respondent contends that where there is a relatively permanent decline in normal earning capacity during the base period, normal earnings are to be reconstructed "by relating the net earnings of the entire enterprise for a period immediately preceding January 1, 1940, to the various base period years through the application of an appropriate index," with preference to the Series C Statistics of Income, General Index, to the exclusion of an index having the influence of the relatively permanent changes. Such a reconstruction, respondent contends, would give petitioner no relief.

Upon a careful consideration of the record, we are convinced that by the end of the base period petitioner's business was not in a state of relatively permanent decline. Although there can be no doubt from the evidence adduced that to some extent some advertisers did not like to use magazines printed in gravure and that some purchasers of magazines felt that those printed in gravure were of inferior quality, and that radio and other types of magazines were taking advertising dollars, we do not believe that these factors showed that there was a permanent decline in petitioner's business by the end of the base period.

First, except for Woman's Home Companion, petitioner's magazines at the end of 1939 were showing a decided upward trend in revenue over that received in 1938. And the evidence convinces us that such decreases as did occur in 1938 were not due to petitioner's use of high-speed gravure printing. We know, for example, that Woman's Home Companion had a stable share of the market even though substantial gravure printing appeared in it in 1937, and no gravure printing appeared in it in 1938. We also know that The Saturday Evening Post, which was printed in letterpress, lost a greater share of the market than petitioner's comparable Collier's which was using gravure. The demise of Country Life in 1939 cannot be attributed to its use of gravure. Other causes than the use of gravure brought about the demise of Country Life. There would have to be a more marked showing that use of gravure caused petitioner to lose business than is the case here for us to conclude that its use caused petitioner to be in a state of relatively permanent decline.

As further evidence of the absence of any relatively permanent decline insofar as petitioner is concerned, Collier's main competitor, The Saturday Evening Post, lost 2 cents per page advertising revenue from 1936 to 1939, while Collier's stayed stable. The Ladies' Home Journal lost 7 cents per page over that period while petitioner's comparable Woman's Home Companion lost 5 cents per page; Cosmo-

politan, the chief competitor of petitioner's The American Magazine, lost 2 cents per page during the same period while The American Magazine stayed stable.

Respondent contends that petitioner was obliged to expend large sums to build up its circulation in the last 2 years of the base period. We do not view this as any evidence of petitioner's decline, particularly when it appears that similar increases in expenditures were made just prior to and early in the base period and petitioner had its 2 best income years thereafter.

Perhaps more basically, a substantial difficulty with respondent's position is that we are dealing with the reconstruction of this petitioner's normal earnings for the base period, and the record establishes to our satisfaction that there was no permanent decline in petitioner's business during the base period. Under the present circumstances, we are not able to accept or to follow respondent's theory that because more dollars were being spent for advertising, for example for radio advertising, petitioner was in a state of relatively permanent decline because it did not obtain these dollars. See *Schneider's Modern Bakery, Inc.*, 19 T. C. 763, in which we said, "There is no precedent either in the statute or the cases under 722 (b) (4) which requires a taxpayer to show relative superiority in the industry." Petitioner could, and did, as a publisher of its various magazines, increase its 1939 revenues over those of 1938, and did so for every magazine except Woman's Home Companion.

And there is more to show that respondent is in error in contending that by the end of the base period petitioner was in a state of permanent decline, if it need be said.

The following table shows that petitioner's advertising revenue, circulation revenue, and combined average net paid circulation per issue increased as follows:

| Year | Advertising revenue | Circulation revenue | Combined average net paid circulation per issue |
|---|---|---|---|
| 1936 | $19, 057, 000 | $10, 346, 000 | 7, 310, 226 |
| 1937 | 21, 202, 000 | 10, 627, 000 | 7, 657, 683 |
| 1938 | 18, 465, 000 | 10, 655, 000 | 7, 809, 970 |
| 1939 | 19, 180, 000 | 10, 802, 000 | 7, 953, 380 |

Its excess profits net income, before any statutory adjustments, was as follows:

| Year | Amount |
|---|---|
| 1936 | $3, 481, 602. 49 |
| 1937 | 3, 414, 004. 90 |
| 1938 | 1, 853, 404. 05 |
| 1939 | 2, 100, 344. 14 |

Moreover, viewed from the long-range history of petitioner's earnings, the fluctuations are not such as to convince us that petitioner was in relatively permanent decline. The year 1938 was generally a bad year for all business and particularly so for the magazine industry. Petitioner's income for 1939 greatly exceeded the annual average of its income from 1922–1939 and was considerably larger than many of its years prior to the base period. Broadly viewed, these facts establish that petitioner was not in a state of relatively permanent decline.

All of the foregoing causes us to conclude that this is not the occasion for resort to the principles involved in the concept of "relatively permanent decline" and thus put a ceiling on petitioner's reconstruction as outlined in E. P. C. 42, *supra*. Respondent, in his brief, lays great stress on E. P. C. 42. We do not think it is applicable to the facts in the instant case. See *Charis Corporation, supra; Brown Paper Mill Co., supra; Beringer Bros., Inc.,* 18 T. C. 615; *Nielsen Lithographing Co.,* 19 T. C. 605; *East Texas Theatres, Inc.,* 19 T. C. 615, and *Jefferson Amusement Co.,* 18 T. C. 44 (in all of which relief was granted under section 722 (b) (4) in the face of base period declining earnings).

There is a preliminary question as to whether petitioner's reconstruction is to be made on the basis of the 6 gravure presses which were actually installed during the base period plus the 2 which were ordered and installed in 1941, petitioner having in 1937 set up a replacement schedule for presses which contemplated the replacement of 17 letterpresses with the same number of high-speed gravure presses. We believe that petitioner's reconstruction should include the 2 presses ordered and installed in 1941. See *Springfield Tablet Manufacturing Co.,* 22 T. C. 35, and *Studio Theatre Inc.,* 18 T. C. 548. In the latter case it was said:

The record as a whole shows in our opinion that petitioner made "changes in position unequivocally establishing the intent to make the changes [in capacity for production or operation]," and that is enough to establish the "commitment" required by the statute. S. Rept. No. 1631, 77th Cong., 2d Sess., p. 202; see also Treasury Regulations 112, sec. 35.722–3 (*d*).

In that case it was held on the basis of the legislative history [1] that the absence of a contract was not necessarily conclusive on the question of commitment. The Opinion quoted from the legislative history as follows:

"Progress to the point where the taxpayer could not withdraw without substantial detriment may be given substantial weight in determining whether or not taxpayer has committed itself * * *. On the other hand, commitment claims are not to be rejected solely on the ground that taxpayers which have otherwise complied with all of the essentials in commitment cases may, nevertheless, be in a position where they might have withdrawn without substantial detriment prior to January 1, 1940."

---

[1] S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 201–202.

At this point we think that attention should be called to the fact that in the year 1939, petitioner had an extensive training program in force. The testimony shows that more than 30 employees were being trained during that year, not for immediate production but in anticipation of future needs, including those presses which were ordered in 1940. This training program was necessary because it took a period of 2 or more years to train a gravure preparatory employee, whereas it was possible to order and install the presses in a shorter period. The expenses of this training program were a financial commitment of substantial proportions within the meaning of section 722 (b) (4). The part of section 722 (b) (4) which we think is here applicable reads as follows:

Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business, * * *

## Push-Back.

In connection with a reconstruction, respondent has a further position which is that petitioner must be denied the use of the push-back rule because petitioner has not shown that had it made the change 2 years before it did so it would have reached a higher level of earnings. He argues that had petitioner instituted the change 2 years earlier there would have been no available gravure preparatory workers and other aids to the production of satisfactory high-speed multicolor gravure. But on the basis of the established facts, we conclude, as our findings disclose, that had petitioner started 2 years earlier, by the end of 1939 it would have obtained and trained the necessary gravure preparatory workers, been able to sell and print its advertising in multicolor gravure, and thus would have been able to effect additional cost savings which we have long regarded as the equivalent of increased income.

We think petitioner has established by facts proved at the hearing that it is entitled to the use of the 2-year push-back rule in this matter of a substantial changeover to gravure printing and we have used it in our reconstruction.

In considering the amount of petitioner's reconstructed base period earnings attributable to the two 722 (b) (4) changes which we have been discussing, we are constrained to note that the computation on the part of petitioner must stem from an inherent optimism, a failure to deal with all the conditions which prevailed and attended the change to the use of high-speed multicolor gravure, and other infirmities. But we are satisfied that there is a satisfactory showing justifying some relief for petitioner and we have so determined in our ultimate findings of fact, which read as follows:

### Ultimate Facts.

Petitioner's base period discontinuance of Country Home and its base period adoption of multicolor high-speed gravure printing constituted changes in the character of its business within the meaning of section 722 (b) (4).

Petitioner's base period net income is an inadequate standard of normal earnings because of these changes.

Petitioner did not reach by the end of 1939 the earning level it would have reached had it made its multicolor high-speed gravure change 2 years before it did so.

A fair and just amount to represent petitioner's constructive average base period net income is $518,000 in excess of its average base period net income, after adjustments already allowed in the deficiency notice under section 711.

Our reconstruction under which we have reached the CABPNI shown in our ultimate findings has been made upon a consideration of the entire record.

### Section 721 (a) (2) (C).

Petitioner also claims relief by reason of base period expenditures for research and development as provided in section 721 (a) (2) (C).[2] Included in the burden of proof which was on petitioner in connection with its claim for relief under 721 (a) (2) (C) is the fact that there were expenditures by petitioner for research and development of multicolor high-speed gravure and the amount therefor. Petitioner, in an effort to establish its claim under section 721, chose to rely upon the testimony of John C. Kreis, an employee who had been with it for years and who, since 1933, had been foreman of its photographic department wherein the alleged expenses arose. His testimony related to a schedule of penciled figures prepared in 1948 and

---

[2] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

\* \* \* \* \* \* \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months ; \* \* \*

\* \* \* \* \* \* \*

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable. year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

purporting to be the total compensation paid in 1933 through 1945 to certain employees in petitioner's gravure preparatory department. The 1933 through 1936 figures were indicated to be estimates. A further part of the schedules sets forth the names of 32 employees with a percentage opposite the names of most of them for the years 1933 through 1945, purporting to be Kreis' judgment of the time spent by them on "research" or "nonproductive" work. None of these crucial facts were otherwise established by competent evidence. The percentages were obtained by interviews which Kreis held with the men, together with his own recollections refreshed by an existing personal diary. The witness demonstrated no clarity as to what constituted "research" and initially was consistently of the view that the work involved was gravure training, and finally he agreed that it was "nonproductive" as distinguished from "productive" work. All but one of those listed were supervisory employees in petitioner's gravure preparatory department. The testimony which petitioner introduced in support of its 721 (a) (2) (C) claim does not, in our judgment, justify us in concluding that petitioner has sustained its burden of proof on this issue.

We must, therefore, conclude that the record furnishes no basis for an ascertainment of the existence of research labor costs in the development of multicolor gravure printing process or of the years in which such expenditures might have been made. The absence of such material is fatal to petitioner's 721 (a) (2) (C) claims, for without it the petitioner is not able to satisfy the statute by making, for the years 1940 through 1945, a computation of the allocation of percentages to be applied to net abnormal income for the pertinent years and the further computation of net abnormal income and the allocation of net abnormal income to the years in which the research took place. See *Powell-Hackney Grocery Co.*, 17 T. C. 1489, 1491.

Moreover, although our findings disclose that petitioner during the pertinent years had some activity which might qualify as research and development activity, it was insignificant, we think, compared to the obvious fact that most of what petitioner is claiming to be research and development expenses has not been shown to be such, but rather appears to be the training of personnel in the gravure process (which petitioner admittedly needed), the development through experience (including visits to other plants) of gravure skills and techniques, and the adaptation and use of important machines and processes developed by others. Cf. *Steel or Bronze Piston Ring Corporation*, 13 T. C. 636.

The record is such that there are not sufficient foundations for us to make findings either as to amounts of research labor costs and in what years they were expended, or the extent of petitioner's true

research and development activity. This issue is decided for respondent.

## Section 711.

Petitioner also claims that it is entitled to additional relief by reason of the provisions of section 711 which provides for adjustments for abnormal deductions. This is in addition to other section 711 adjustments which have been allowed by respondent in his deficiency notice. Petitioner urges that base period deductions relating to an employees' bonus, executives' bonuses, and moving of power lines were abnormal within the section. The applicable statute is printed in the margin.[3] With respect to the employees' bonus and the cost of moving power lines, petitioner contends that they are abnormal expenditures in class and should be disallowed because they fall within the ambit of section 711 (b) (1) (J) (i). As to the executives' bonuses which were paid by petitioner during the years 1936 and 1937, petitioner does not contend that they were abnormalities in class within the meaning of section 711 (b) (1) (J) (i) but petitioner does contend that these executives' bonuses were abnormal in amount and come within the provisions of section 711 (b) (1) (J) (ii) and should be allowed to the extent which the statute provides.

We shall first take up the amount which petitioner paid out in employees' bonuses in 1936 and the amount which it paid for moving certain power lines in 1938 in its plant at Springfield. Insofar as

---

[3] SEC. 711. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)):

\*   \*   \*   \*   \*   \*   \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

\*   \*   \*   \*   \*   \*   \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

the amounts paid in these respects, there is no dispute. That has been stipulated. We do not think that either of these expenditures is entitled to a separate classification for they are not shown to differ substantially from many other items in other groupings of expenditures. See *Frank H. Fleer Corporation*, 10 T. C. 191, and *Great American Indemnity Co.*, 19 T. C. 229, affid. (C. A. 2) 211 F. 2d 407. The employees' bonus payments are shown by the record to be additional compensation and, as such, are not to be afforded a separate classification for the purpose of section 711 (b) (1) (J) (i). The employees' bonus followed the discontinuance of a savings and profits plan to which petitioner had contributed in somewhat lesser amounts to that paid in 1936, which is here in question.

The case at bar is obviously distinguishable from *Mine & Smelter Supply Co.*, 10 T. C. 1179, upon which petitioner relies where the bonus amounted to over one-fourth of petitioner's then outstanding capital stock, the par value of the bonus stock exceeded the total annual basic salaries of the participants, and the company had never before issued such a stock bonus, and did not contemplate another in the future.

And the expenses for moving the power lines in petitioner's plant at Springfield, Ohio, were part of an expansion of its facilities and they are not shown to be different from comparable general expenditures for maintenance and repairs, or entitled to a separate classification. See *Tovrea Land & Cattle Co.*, 10 T. C. 90.

A different situation exists as to the executives' bonuses which were paid in 1936 and 1937, due to the good earnings which existed in those years. They were not paid in 1938 and 1939, due to the falling off in business in those years. They were not paid again until the years 1943, 1944, and 1945, when they were paid in the amounts shown in our Findings of Fact because of the notable increases of petitioner's income in those years. We agree with petitioner that these executives' bonuses which it paid in 1936 and 1937 were abnormal in amount within the meaning of section 711 (b) (1) (J) (ii). But petitioner has not only the burden of showing that these executives' bonuses were abnormal in amount but petitioner must go further and show that the limitations of section 711 (b) (1) (K) (ii) do not apply. The amount of bonus payments which petitioner made to its executive employees in the calendar years 1936 and 1937 was determined in accordance with an executives' bonus plan which had been formally adopted in the year 1931, and modified in minor respects in 1936. The petitioner's failure to make any bonus payments in the years 1932 to 1935, inclusive, or in the years 1938 to 1942, inclusive, was a direct result of its failure to have sufficient earnings to call for the payment of any bonuses under the terms of such plan. By the same token, the

bonuses actually paid to executives in the years 1936 and 1937 were the direct result of the increased earnings which petitioner realized in such years.

The provisions of section 711 (b) (1) (K) (ii) (footnote 3, *supra*) require that the taxpayer establish that the section 711 (b) (1) (J) expenses were not a consequence of an increase in petitioner's gross income, a decrease in the amount of some other deduction, or a change in the size of petitioner's business. See *Matheson Co.*, 16 T. C. 478, 489. Petitioner urges that we are precluded by such cases as *Wentworth Manufacturing Co.*, 6 T. C. 1201, from considering the application of section 711 (b) (1) (K) (ii) because it was not delineated in the notice of deficiency or by respondent's affirmative pleadings. We do not perceive the authorities require more than that the issue be raised by the pleadings and not injected by argument belatedly raised in the briefs. In the case at bar, the petition in its various assignments of error has assigned error from respondent's failure to disallow the deduction "under the provisions of Sections 711 (b) (1) (J) and 711 (b) (1) (K) of the Internal Revenue Code," and these allegations. were denied by the answer. The issue was framed by the pleading.

Under the circumstances, we conclude that petitioner is not entitled, under section 711 (b) (1)( J) (ii) and (K) (ii), to have disallowed the executives' bonuses paid in 1936 and 1937. As to this issue we hold in favor of respondent .

*Section 711 (b) (1) (J) Adjustments Made in the Deficiency Notice.*

We have just ruled against petitioner as to the three section 711 (b) (1) (J) adjustments which were in issue because of the fact that petitioner was claiming them in addition to other 711 (b) (1) (J) adjustments which respondent disallowed in his deficiency notice. Respondent, in his deficiency notice, made certain adjustments under section 711 for each of the base period years 1936 to 1939, inclusive, and the result of these adjustments is given in our Findings of Fact. After these adjustments are taken into account petitioner's average excess profits net income as finally determined by the respondent for the years 1936 to 1939, inclusive, was:

| Year | After all adjustments allowed or allowable under section 711— | | |
|---|---|---|---|
| | for 1943 | for 1944 | for 1945 |
| 1936 | $3, 481, 602. 49 | $3, 482, 271. 63 | $3. 482, 271. 63 |
| 1937 | 3, 553, 112. 65 | 3, 547, 283. 59 | 3, 561. 743. 47 |
| 1938 | 2, 002, 676. 64 | 1, 980. 604. 86 | 1, 988. 699. 81 |
| 1939 | 2, 209, 959. 25 | 2, 206, 522. 30 | 2, 206, 522. 30 |
| Average | $2, 811, 837. 76 | $2, 804, 170. 60 | $2, 809, 809. 30 |

It is therefore our conclusion that petitioner is entitled to use as a CAIPNI in the computation of its excess profits tax for the years 1943, 1944, and 1945, the above average amounts plus $518,000, which is the sum we have determined should be added because of the two 722 (b) (4) factors which we have held to exist. See *East Texas Theatres, Inc.*, 19 T. C. 615, 631; *Jefferson Amusement Co.*, 18 T. C. 44, 64. Cf. *Southern California Edison Co.*, 19 T. C. 935, 996, 997.

With respect to the question of unused excess profits credit carry-over for 1941, which is a matter for recomputation under Rule 50, the parties are in agreement that the "variable credit rule" provided for in the Bulletin on Section 722, and Regulations 112, section 35.722-3 (*d*), should be applied. There is, therefore, no issue between the parties as to the application of the variable credit rule for 1941.

Reviewed as to section 721 (a) (2) (C) and section 722 issues by the Special Division.

*Decision will be entered under Rule 50.*