BASIN OIL CO. OF CALIFORNIA (FORMERLY BASIN OIL CO.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41125.    Filed April 10, 1959.

*A. Calder Mackay, Esq.*, and *Stafford R. Grady, Esq.*, for the petitioner.
*Raymon B. Sullivan, Esq.*, for the respondent.

OPINION.

FORRESTER, *Judge:* Petitioner's excess profits credit as computed under section 713(f), I.R.C. 1939,[1] is $73,075.64.

The respondent allowed in part petitioner's application for relief under section 722 (a) and (b)(4)[2] and determined a constructive average base period net income (CABPNI) in the amount of $95,731, resulting in a deficiency of $494.57 in income tax and a liability of $27,297.26 and an overassessment of $6,846.96 in excess profits tax for the taxable year ended March 31, 1941, which is the only year before the Court.

Petitioner does not contest the income tax deficiency and in this proceeding asks a refund of excess profits tax in the amount of $34,144.22.

All jurisdictional facts have been stipulated and it has been stipulated that petitioner qualifies for relief under section 722(b)(4) as follows:

(a) Petitioner commenced business during the base period and its average base period net income does not reflect normal operations for the entire base period. Petitioner's business did not reach, by the end of the base period, the earning level it would have reached if it had commenced business two years earlier than it did.

(b) Petitioner changed the character of its business during the base period and its average base period net income does not reflect normal operations for the entire base period. There were changes in the capacity for production and/

---

[1] All references to the Internal Revenue Code are to the Internal Revenue Code of 1939.

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing *normal earnings* to be used as a [CABPNI] for the purposes of an excess profits tax based upon a comparison of *normal earnings* and *earnings* during an excess profits tax period, the tax shall be determined by using such [CABPNI] * * *. In determining such [CABPNI], no regard shall be had to events * * * occurring * * * after December 31, 1939, except that, in cases described in the last sentence of section 722(b)(4) * * * regard shall be had to the change in the character of the business under section 722(b)(4) * * * to the extent necessary to establish the *normal earnings* to be used as the [CABPNI].

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income * * * if its average base period net income is an inadequate standard of *normal earnings* because—

* * * * * * *

(4) the taxpayer * * * during * * * the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business * * * did not reach, by the end of the base period, the *earning level* which it would have reached if the taxpayer had commenced business or made the change * * * two years before it did so, it shall be deemed * * * [to have done so] at such earlier time. * * * Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business * * * [Emphasis supplied.]

or operation of petitioner's business during the base period. There were changes in the capacity for production and/or operation of petitioner's business consummated after December 31, 1939, as a result of a course of action to which petitioner was committed prior to January 1, 1940. Because the said change in the character of petitioner's business was not made two years earlier, and because the said committed for change in capacity for production and/or operation was not consummated by December 31, 1939, petitioner did not reach a normal level of earnings by the end of the base period.

Thus the ultimate question presented is whether petitioner has established a fair and just amount representing normal earnings to be used as a CABPNI in excess of such amount as determined and allowed by respondent.

The evidence in this case was presented before a commissioner of this Court who made a report of his findings of fact, which has heretofore been served upon the parties.

Petitioner has taken no exceptions to said report.

Respondent has taken only two exceptions to said report, such disputed findings being:

1. * * * Based upon such information [geological information concerning the characteristics of the oil pool into which it was drilling] and years of practical experience, petitioner's geologist and petroleum engineer could make a reasonably accurate prognostication of the future productive capacity of the wells then in existence and, also, of the anticipated location, depth and productive capacity of additional wells which petitioner planned to drill. [And]

2. [Under the push-back rule, and *if petitioner's commitment or plan had been strictly followed*] * * * petitioner's total production (in round figures) would have been 700,000 barrels of oil for the fiscal year ended March 31, 1939 * * *

We have given careful consideration to respondent's exceptions but feel that the findings are fully justified and supported by the record. Said exceptions are denied and the commissioner's report is adopted.

In the interest of a better understanding of our disposition of the case, certain of the facts, as found, are repeated herein.

Petitioner was incorporated on March 1, 1938, and has operated at all material times on a fiscal year ended March 31 and on an accrual method of accounting. All returns were filed with the then collector of internal revenue for the sixth district of California.

Even though the record shows only a very limited operation encompassing 2 leases and 1 supplemental agreement covering a total of 210 acres and making available to petitioner 2 proven or known oil pools, one of which was quite small, yet it has been stipulated that "[s]ince its inception, petitioner has been engaged in the business of drilling and operating oil wells and marketing the resultant products therefrom."

With respect to one lease, petitioner completed its first producing oil well in May 1938 and with respect to the other, petitioner completed its first producing well in October 1939. Petitioner was drill-

ing in a proven field and as far as the record shows did not ever have a dry hole.

Petitioner's method of operation was to initially drill and cement its well casings through several oil-bearing zones at various levels to the deepest zone of oil-bearing sands. Thereafter, under normal operating conditions, each well would have produced oil at its initial highest rate of flow for a few days followed by a declining curve rate of production and, also, petitioner would have incurred, at various times in the life of some of the wells, additional intangible drilling expenses resulting from its relatively inexpensive process of recompletion of the well at each zone level, that is, "punching back" the original casing to open the various zones to production, one at a time from the deepest to the shallowest level.

Although the record is not entirely clear, we have concluded that all wells were not recompleted because it was found that less than all sometimes drained a given level satisfactorily. Under its leases and agreements respecting both properties, petitioner was obligated to commence the drilling of successive wells within 90 days after completion of the preceding well, and ultimately to drill a minimum of 1 well for every 10 acres for a total of 21 wells.

Petitioner utilized at all material times (except for an accidental and uncontrolled flow of short duration from one well) a so-called maximum efficient rate of production (referred to in the industry and hereinafter as M.E.R.), which utilized a controlled flow of oil requiring the lowest gas-oil ratio, i.e., the minimum amount of gas required to lift 1 barrel of oil to the surface.

On January 22, 1940, in order to fulfill its lease requirements, for the purpose of advising its buyer as to estimated future production of oil and in order to develop its leases efficiently, the petitioner planned its immediate future drilling program, which plan covered the next 7 wells proposed to be drilled and prognosticated for each the completion date and expected number of barrels of oil per day through the month of March 1941. This plan called for the 7 wells to be drilled and producing by July 1940 even though petitioner's minimum requirement under its contracts was for only approximately 5 new wells per year.

The plan was based upon information compiled by and available to petitioner and its geologist and petroleum engineer as of December 31, 1939, from the 6 wells then producing and from the core analysis of 2 wells then being drilled.

The chart appearing immediately below shows the detail of said plan for future drilling and also shows the expected future production of the wells that were then in existence [3] and shows as to existing and

---

[3] One existing well which produced only 142 barrels in fiscal 1941 before "going dry" has been eliminated as *de minimus*.

proposed wells the expected production and monthly decline in production. All figures are barrels of oil per day.

| Well No. | 1940 | | | | | | | | | | | 1941 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. |
| 1 | 110 | 105 | 100 | 96 | 92 | 88 | 85 | 82 | 79 | 76 | 73 | 70 | 68 | 66 |
| 2 | 70 | 65 | 61 | 57 | 54 | 51 | 48 | 46 | 44 | 42 | 40 | 38 | 36 | 34 |
| 3 | 325 | 295 | 267 | 243 | 222 | 206 | 193 | 181 | 170 | 160 | 150 | 141 | 133 | 125 |
| 4 | 93 | 90 | 88 | 86 | 84 | 82 | 80 | 78 | 76 | 74 | 72 | 70 | 68 | 66 |
| 5 | 95 | 87 | 81 | 75 | 70 | 65 | 61 | 57 | 54 | 51 | 48 | 46 | 44 | 42 |
| 6 | 383 | 350 | 320 | 300 | 282 | 268 | 255 | 243 | 231 | 220 | 210 | 201 | 192 | 184 |
| 7 | 440 | 440 | 400 | 358 | 325 | 295 | 267 | 243 | 222 | 206 | 193 | 181 | 170 | 160 |
| 8 | | 400 | 358 | 325 | 295 | 267 | 243 | 222 | 206 | 193 | 181 | 170 | 160 | 150 |
| 9 | | | 300 | 268 | 244 | 221 | 200 | 182 | 166 | 154 | 145 | 136 | 127 | 120 |
| 10 | | | | 400 | 358 | 325 | 295 | 267 | 243 | 222 | 206 | 193 | 181 | 170 |
| 11 | | | | | 300 | 268 | 244 | 221 | 200 | 182 | 166 | 154 | 145 | 136 |
| 12 | | | | | | 300 | 268 | 244 | 221 | 200 | 182 | 166 | 154 | 145 |
| Total | 1,516 | 1,832 | 1,975 | 2,208 | 2,326 | 2,436 | 2,239 | 2,066 | 1,912 | 1,780 | 1,666 | 1,566 | 1,478 | 1,398 |

Expected daily and monthly production rates for fiscal 1941 under the January 22, 1940, plan were as follows:

| Month | Number of producing wells and total barrels per day | Monthly total |
|---|---|---|
| *1940* | | |
| Feb | 7 wells Nos. 1–7 at 1,516 B/D | 45,480 |
| Mar | 8 wells Nos. 1–8 at 1,832 B/D | 54,960 |
| (End of fiscal year) | | |
| Apr | 9 wells Nos. 1–9 at 1,975 B/D | 59,250 |
| May | 10 wells Nos. 1–10 at 2,208 B/D | 66,240 |
| June | 11 wells Nos. 1–11 at 2,326 B/D | 69,780 |
| July | 12 wells Nos. 1–12 at 2,436 B/D | 73,080 |
| Aug | 12 wells Nos. 1–12 at 2,239 B/D | 67,170 |
| Sept | 12 wells Nos. 1–12 at 2,066 B/D | 61,980 |
| Oct | 12 wells Nos. 1–12 at 1,912 B/D | 57,360 |
| Nov | 12 wells Nos. 1–12 at 1,780 B/D | 53,400 |
| Dec | 12 wells Nos. 1–12 at 1,666 B/D | 49,980 |
| *1941* | | |
| Jan | 12 wells Nos. 1–12 at 1,566 B/D | 46,980 |
| Feb | 12 wells Nos. 1–12 at 1,478 B/D | 44,340 |
| Mar | 12 wells Nos. 1–12 at 1,398 B/D | 41,940 |
| Total for fiscal year ended Mar. 31, 1941 | | 691,500 |

The drilling program of January 22, 1940, for the completion of 7 additional wells, was ultimately carried out with some modifications as to well locations and completion dates in order to obtain the most efficient utilization of the leases. The 2 wells in process of being drilled at December 31, 1939, were completed in January 1940, during petitioner's fiscal year ended March 31, 1940. During the fiscal year ended March 31, 1941, petitioner completed 4 additional producing wells, on July 14 and August 10, 1940, and January 5 and March 11, 1941. The last of the planned total of 12 wells was completed on

November 25, 1941, during petitioner's fiscal year ended March 31, 1942.

Petitioner's actual total production of clean oil, by years ended March 31, amounted to 150,632 barrels for 1939, 334,661 barrels for 1940, 593,170 barrels for 1941, 525,821 barrels for 1942, and 217,042 barrels for 1943. The seeming contradictions of this production record are because of the initially high and rapidly declining production rates that petitioner forecast and actually got from these wells.

A table reflecting the above figures by well-months of operation (i.e., the number of months each well actually operated in each fiscal year) follows:

| Fiscal year ending Mar. 31— | Well-months operation | Barrels of clean oil |
|---|---|---|
| 1939 | 16 months 29 days | 150,632 |
| 1940 | 58 months 16 days | 334,661 |
| 1941 | 103 months 24 days | 593,170 |
| 1942 | 133 months 5 days | 525,821 |
| 1943 | 144 months 0 days | 217,042 |

Petitioner's actual intangible well-development expenses (both drilling and recompletion) from its start through fiscal year ended March 31, 1943, were as follows:

| Year ended Mar. 31— | Intangible drilling expenses |
|---|---|
| 1938 | $1,642.07 |
| 1939 | 139,627.63 |
| 1940 | 139,195.41 |
| 1941 | 126,277.11 |
| 1942 | 109,476.49 |
| 1943 | None |

Beginning on May 5, 1938, and at all times material here, the Wilshire Oil Company, Inc., was under contract to purchase all crude oil produced by petitioner and to pay certain current posted prices at the time of delivery. There were limitations specified as to quantity and quality, but neither was ever operative to petitioner's detriment either under petitioner's planning or in actual operation.

The petitioner's excess profits net income as finally computed by respondent, under the Revenue Act of 1940, for each of the base period years, amounted to $18,735.39, $12,472.45, $18,103.02, and $89,739.78 for the years ended March 31, 1937, 1938, 1939, and 1940, respectively.

Petitioner's excess profits net income, as finally determined by respondent, is $183,936.61, for the taxable year ended March 31, 1941.

1. In this case petitioner and respondent are in fairly close accord as to all cost figures except intangible well-development expense. They are also in fairly close accord as to reconstructed rate of production, but in violent disagreement as to use of the so-called variable

credit rule [4] (hereinafter referred to as V.C.R.). We therefore confine our discussion to those two factors and their effects.

What is perhaps the clearest statement of the V.C.R. is found in the Commissioner's Bulletin on Section 722 published in November 1944, at page 120:

The preceding discussion has been limited to those cases in which the [CABPNI] to be used as a standard for the new or changed business under section 722(b)(4) is based on the full level of *normal earning capacity*. If [such] business * * * has reached its full level of *normal operations* during the excess profits tax taxable years, the standard so obtained is a fair measure of *normal profits*. However, there are instances in which the business may not have reached its full level of *normal operations* during the excess profits tax taxable years. In such situations it would obviously be unfair to allow the use of a "yardstick," based on *full level of normal operations*, for the measurement of earnings based on operations which have not reached that level. The regulations provide in such cases for the determination of a fair and just amount representing *normal earnings* which amount may vary in different excess profits tax taxable years. * * * [Emphasis supplied.]

It is noted that this statement, like the statute, recognizes "normal profits" or "normal operations" as the basis or factor to be compared.

Respondent argues that since petitioner's qualifying commitment and plan contemplated 12 producing wells, all producing by and after July of the reconstructed fiscal year ended March 31, 1939, and since 5 of these wells did not produce during all of the tax year before us, that a V.C.R. factor of 72 per cent should be used. Respondent arrives at such factor by comparing actual well-months of operation during fiscal 1941 with 144 which is the maximum possible number of well-months if all 12 wells had operated for the entire year.

Petitioner urges barrels of oil as the proper unit to be "normalized" rather than well-days of operation and argues that production itself is the true test; that since actual production in the tax year exceeded that contemplated by its plan for its reconstructed last base period year, that the V.C.R. should be applied in its favor (presumably by use of a factor greater than 100 per cent), or at least, not used to its detriment.

Each argument has the virtue of simplicity and ease of application, but each is fatally defective. Neither gives any consideration to the initially high and rapidly declining production from each new well and the relatively large acquisition costs of such wells, which costs were deducted in each year as the wells were drilled.

A fallacy of respondent's argument is demonstrated by one of his

---

[4] Although it has been said that the V.C.R. is not strictly statutory, it is clearly founded upon and flows naturally from the provisions of section 722 (a) and (b)(4), *supra*, in that 722(a) requires consideration of post-December 31, 1939, events, in "commitment" cases, to the extent necessary to determine the normal earnings to be used as the CABPNI. (It is noted that the statutory phrase is "normal earnings" (the resultant of many factors) and not "production" (one of the factors).)

own examples on brief in which he points out, in contesting the finding of production of 700,000 barrels for reconstructed fiscal 1939 under petitioner's plan, that in the year ended March 31, 1943, which was the first full year all 12 wells operated, production was only 217,042 barrels. The reason is obvious. By fiscal 1943 all of these wells but one were more than a year old, and had advanced along the declining production-rate curve. Compare petitioner's actual production of 593,170 barrels in fiscal 1941 from less than 104 well-months of operation with the fiscal 1943 production of 217,042 barrels from 144 well-months.

A further illustration of this varying production rate is that in fiscal 1941 petitioner produced from 11 wells, 6 of which were completed after December 31, 1939, and obviously constituted $6/_{11}$ths or 54½ per cent of petitioner's wells for such year, yet these 6 wells produced almost 68 per cent of petitioner's total fiscal 1941 production despite the fact that well-days of operation for the 6 was only 60 per cent of their potential for such year and only 33 per cent of the total well-days for all 11 wells. Consequently, 33 per cent of petitioner's well-days produced 68 per cent of its product in fiscal 1941.

"Commitment" cases, such as *Hydraulic Press Manufacturing Co.*, 27 T.C. 278, cited by respondent and applying the V.C.R. where there is a direct and fairly constant relationship or ratio between a substantially level production rate from the anticipated facility and normal earnings, do not support respondent's argument for use of facility as such, and divorced from normal earnings, as the element to be compared.

Petitioner's argument that rate of production be the sole criterion and that the V.C.R. should therefore operate in its favor (or not be used at all) is equally fallacious in that it ignores drilling costs—a very important element of "normal operations" or "normal profits."

Finally, respondent urges that petitioner's argument against use of the V.C.R., being based solely on actual production figures, is suspect in that such high actual production in the tax year might have been outside of petitioner's qualifying commitment since achievable through stepping up production from existing, rather than from new wells and therefore the same as putting previously idle equipment to use, or adding a second shift in a manufacturing plant. There is no basis in the record for this argument of respondent. In fact the record is clear that M.E.R. production was followed at all times in fiscal 1941. We have rejected petitioner's argument but not for this reason.

We conclude that neither party has correctly interpreted or applied the V.C.R. We apply it by normalizing petitioner's base-period earning level through consideration of all relevant factors and then

considering whether that earning level was fully utilized during the tax year before us. Cf. *East Texas Motor Freight Lines*, 7 T.C. 579, 592.

2. The so-called abandonment rule is simply an aspect of the V.C.R. and based upon the same statutory foundations.[5] Its principles have therefore been strongly urged by respondent.

In the instant case the declining production rate and presumed eventual exhaustion of the wells upon which our reconstruction is based is closely akin to the sale or disposition of a facility for production and consequent "abandonment" unless replaced. No substantial drilling of new wells after fiscal 1941 is shown by the record and a decrease in production of over 50 per cent occurred between fiscal 1942 and fiscal 1943. However, substantial increases in production occurred in fiscal 1944 and fiscal 1945 even though only one new well was drilled, and that in March 1944.

There is such evidence in the record, and we conclude that these increases are the result of petitioner's "punch-back" or "recompletion" drilling activities which therefore constitute a degree of replacement. Also, respondent has stipulated that petitioner has been engaged in the business of drilling and operating oil wells since its inception. Such stipulation indicates no abandonment.

In any event, we have only fiscal 1941 before us, no measurable exhaustion had then occurred and petitioner then had to drill at least 9 new wells at some future time in order to fulfill its minimum lease requirements. We conclude that no adjustment based on abandonment is warranted.

---

[5] The clearest statement of the rule is again found in the Commissioner's Bulletin on Section 722, *supra*, at pages 123–124 as follows:

"[This] situation arises where the taxpayer abandons the change which gave rise to the claim for relief. This abandonment may occur with respect to any of the changes in the character of the business included within section 722(b)(4). In the case of a change based upon the acquisition of facilities, abandonment will be deemed to have occurred if the taxpayer disposes of the new facilities without replacing them with other assets which produce income for excess profits tax purposes. In all these instances, the taxpayer will be considered to have reverted to its former character and the conditions which warranted relief in earlier years will no longer exist.

"It should be remembered that the taxpayer is required to establish its right to relief for each excess profits tax taxable year. Its relief is based upon 'a comparison of normal earnings and earnings during an excess profits tax period.' Implicit in this comparison is the idea that the normal operating conditions, upon which relief is based, and the operating conditions during the excess profits tax period must be comparable. If in some excess profits tax taxable year the taxpayer has reverted to its earlier character, normal operating conditions for it must be based on that earlier character. Its actual average base period net income would therefore not be an inadequate standard of normal earnings for that year, and it would not be entitled to relief.

\*   \*   \*   \*   \*   \*

"The failure of the taxpayer to qualify for relief is based upon its inability to establish the inadequacy of base period income as a standard of normal earnings. The establishment of such an inadequacy is a prerequisite to the right of a taxpayer to a reconstruction of such base period income. Accordingly, the prohibition contained in section 722(a) against regarding post-1939 events in the course of the actual reconstruction of base period income is not involved."

In reconstructing petitioner's base period years under its qualifying factors we have used the so-called push-back rule. *Del Mar Turf Club*, 16 T.C. 749, 766. In that case we said:

> The purpose of the 2-year push-back rule is to establish a figure which is assumed to be the maximum amount which would have been earned by the tax-payer in its last base period year, if it had commenced business 2 years before it did. Once one has arrived at this assumed figure, the function of the 2-year push-back rule has been achieved and we are no longer concerned with it. Such assumed figure is then used as a point of departure in reconstructing the tax-paper's average base period net income (using appropriate indices based on national income, state income, industry experience, corporate profits, etc.) in order to determine his excess profits credit. See *Suburban Transportation System*, 14 T.C. 823, 829 (1950).

We believe that petitioner's plan of January 22, 1940, was unduly optimistic in projecting the completion of 7 new wells in the short space of 6 months. Such projection was more than double petitioner's minimum contractual requirements and the testimony of Dr. Willis is reasonable in illustrating that the plan was flexible to the extent of adjustment for unforeseen events encountered in its execution.

In view of all the circumstances we feel that the timing of the actual drilling was closer to a normal forecast than the plan itself and we have accordingly made adjustments to both production and cost figures of petitioner's last 2 reconstructed base period years.[6]

The fact that in execution there was a time lag, or a lengthening-out—in short, a change—in petitioner's plan does not, in this case, destroy its character as strong evidence of a qualifying commitment or prevent our use of its contemplated production and costs in reconstruction. The changes were not very great. It is still easily recognizable as petitioner's plan of January 22, 1940. Cf. the relief granted in *Studio Theatre Inc.*, 18 T.C. 548, in which case petitioner decided in 1935 to enlarge its theatre building, leased adjoining property for that purpose in 1939 and then struggled for the necessary building funds until 1942 and finally completed the planned enlargement in that year. Also compare the relief granted in *Crowell-Collier Publishing Co.*, 25 T.C. 1268, as to two letter presses actually installed in 1941 under a 1937 qualifying plan which contemplated such installation much earlier and probably in 1939.

---

[6] The following table shows the planned and the actual production months for reconstructed fiscal 1940 of petitioner's last 5 wells:

|  | Planned (Month of Well's Life) | Actual (Month of Well's Life) |
|---|---|---|
| Well No. 8 | 14th through 25th | 9th through 20th |
| Well No. 9 | 13th " 24th | 10th " 21st |
| Well No. 10 | 12th " 23d | 4th " 15th |
| Well No. 11 | 11th " 22d | 1st " 5th |
| Well No. 12 | 10th " 21st | 2d " 13th |

A total of 60 production months was planned, only 52+ months were actually attained, yet production from these 5 wells was almost 75,000 barrels more than planned because the wells were not so old.

We have carefully analyzed and considered post-December 31, 1939, events, as is authorized by the statute,[7] to determine what portion of petitioner's reconstructed normal earnings should be used as its CABPNI for the tax year before us, i.e., the V.C.R. See *Springfield Tablet Manufacturing Co.*, 22 T.C. 35, 41.

We have concluded that because of the anticipated and actual high or flush production from new wells in fiscal 1941 that reconstructed base period production was being exceeded (even though reconstructed well-months were not fully utilized) but that actual intangible well-development expense exceeded the reconstructed normal. The combined effect of these two factors shows that petitioner's reconstructed normal earning level was not being fully utilized during the tax year before us and this small resultant has become our comparative for use under the V.C.R.

We have used the index figure of 91.2 proposed by the parties, as appropriate for backcasting.

In the exercise of our best judgment we have determined that petitioner's excess profits tax for fiscal 1941, computed without the benefit of section 722, results in an excessive and discriminatory tax and that a fair and just CABPNI for such year is $135,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

---

[7] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—* * * no regard shall be had to events * * * after December 31, 1939, *except* * * * [to determine] * * * change in the character of the business * * * to the extent necessary to establish the *normal earnings* to be used as the [CABPNI]. [Emphasis supplied.]